VINING *v.* MILLAR.

CHATTEL MORTGAGE—PRIORITY OF LIEN—CONFLICT OF LAWS.

A chattel mortgage on horses, given in Canada by the owner of a half interest in them, and filed by the mortgagee, who takes possession of the horses, and puts them in the care of the keeper of an hotel at a race track, to hold possession for him, gives such mortgagee a better right to such interest in the horses after they have been taken without his consent from the custodian, and shipped to Michigan, by the owners of the other half interest in the horses, who did not know of his mortgage, than the latter can assert under another chattel mortgage from the same mortgagor, which they took in Michigan before the horses went to Canada, and recorded after their return. GRANT, J., dissenting.

Error to Wayne; Lillibridge, J. Submitted January 9, 1896. Decided May 12, 1896.

Replevin by James B. Vining and Donald Ferguson against Charles Millar and another for property seized under a chattel mortgage. From a judgment for plaintiffs on verdict directed by the court, defendants bring error. Reversed.

*Moore & Moore*, for appellants.

*Brooke & Spalding*, for appellees.

GRANT, J. (*dissenting*). The following statement of facts is taken from the brief in behalf of the plaintiffs, and is correct:

" On October 11th, the plaintiffs, who were residents of Canada, advanced to one George Leroy, a resident of Illinois, at Detroit, Michigan, $1,600, and took from him a chattel mortgage covering a one-half interest in three trotting horses, which interest was then owned by Leroy. The other one-half interest in two of the horses was owned by the plaintiffs, and in the third horse by another person, not a party to this suit. The plaintiffs and Leroy, at or about the execution of the mortgage, agreed that these horses should be raced on joint account during the winter of 1892 and the racing season of 1893, the winter racing to be in the Southern United States; the plaintiff Vining to manage the horses, making all contracts and entries, collecting the moneys, and doing all the business, Leroy to do the driving, and the money for expenses to be furnished by the plaintiffs, the profits and losses of the racing to be equally shared among the three. This arrangement was not to affect the property rights of the several parties in the horses. At the time of the execution of the mortgage, it was contemplated by the parties that the horses should be taken out of the State, and they were then on board the cars in Detroit for shipment South, and went out of the State in the afternoon of the same day.

" After racing the horses in the Southern States through the winter and spring, they were shipped back from the South to London, Canada, on May 4, 1893, and passed through Detroit in transit for London, where they arrived on May 8th. In order to get them into Canada, the plaintiff Vining gave a bond in the sum of $10,000, condi-

tioned to return them to the United States within 70 days.
The racing of the horses was continued in Canada under
the same arrangement; but Vining fell sick, and was
unable to remain with the horses personally.  The horses
were raced at various places in Canada, and finally at
Toronto, at a race meeting beginning about the 3d of
July.  The plaintiff Ferguson attended at these races,
and instructed Leroy to ship the horses on July 10th to
Detroit, where they were next to race, and left him to
do so.  Instead of shipping the horses, Leroy disappeared;
and, the plaintiffs learning from one Stilson, the assistant
driver, who was in their employ, that Leroy had gone,
Ferguson again went to Toronto, and on Saturday, July
15th (the period within which the horses were to be re-
turned according to the condition of the bond being nearly
up), shipped them back to Detroit, where Vining took
charge of them.

"It appears that the horses, before coming to Toronto,
were in Tilsonburg, which is about 100 miles distant, and
in another county.  Leroy had gone ahead to Toronto,
and there met the defendant Millar on June 30th, and
represented to him that he had these horses at Tilson-
burg, and wanted to get them down to Toronto for the
races, and wanted to borrow of Millar money to pay to
bring them and to keep them in Toronto during the races.
Millar gave him some money then, and agreed to make
further advances, taking a mortgage on the horses as
security.  This mortgage Millar filed in the county clerk's
office in Toronto on July 5, 1893.  Defendant Millar tes-
tifies that on July 8th, with Leroy's consent, he put the
horses in the care of one Briggs, the keeper of an hotel at
the race track, to hold possession for him.  At the time
when Ferguson returned to Toronto, after Leroy's disap-
pearance, he found the horses in the possession of Stilson,
the plaintiffs' assistant driver, at the stable of Briggs; saw
Briggs, and paid him all his charges for feeding the men
and horses, and told him he was going to ship the horses.
Briggs made no claim of possession, and Ferguson learned
nothing about Millar or his mortgage.

"On Monday, the 17th of July, when the horses ar-
rived in Detroit, where they were to race, the plaintiffs
recorded their mortgage; and, on the following day, the
defendant Millar came to Detroit, and had the defendant
Fox, who is a constable, seize the horses under his chat-
tel mortgage.  The plaintiffs, to whom this act was the

first notice of Millar's mortgage, demanded the return of the property, and, on its being refused, brought this action of replevin, upon the trial of which a verdict was directed in their favor."

The principal question in the case is whether the defendant Millar's mortgage has preference over that of the plaintiffs, which was prior in date. The question is not new in this court. The principle governing it has been discussed and determined in the following cases: *Montgomery* v. *Wight*, 8 Mich. 143; *Boydson* v. *Goodrich*, 49 Mich. 65; *Corbett* v. *Littlefield*, 84 Mich. 30. In all these cases it was held that chattel-mortgage laws have no force beyond the jurisdiction of the sovereignty enacting them, and that the notices, which the record of them is designed to give, have no extraterritorial force. The reasoning of Justice CAMPBELL in *Montgomery* v. *Wight* is exhaustive and conclusive. It was followed in the other opinions. It may be conceded that the defendant Millar has a lien valid in Canada, and that plaintiffs have a lien valid in Michigan. The parties, therefore, have no other or different rights than they would have if there were no law in either country providing for recording mortgages, and declaring the effect of such record.

It is sought to distinguish this case from the above, upon the claim that Millar had reduced the property to possession in Canada, and that it was illegally and surreptitiously taken from him. In the cases above cited, the property was left in the control of the mortgagor; and in *Corbett* v. *Littlefield* it was held that the attachment lien in this State prevailed, although the property was removed from the State of Nebraska without the knowledge or consent of the mortgagee. The difficulty with the defendants' contention is that the facts do not support it. There was no actual or visible change of possession. The horses were at Mr. Briggs' hotel, and in his possession, at the time defendant Millar claims possession was given to Mr. Briggs for him. This possession was only that of an hotel keeper in charge

of the property of his guest. Millar testified: "I went to the hotel man in whose possession these horses were, and I said to the hotel man, 'These horses remain as between you and me, * * * and you are to keep them for me.'" Plaintiffs were under a heavy bond to return the horses to the United States within a specified time, which had nearly expired. Leroy had been instructed to ship them to Detroit. He failed to do so. By telegram, plaintiffs ascertained that Leroy had left. Plaintiff Ferguson then went to Toronto, and found the horses in the care and control of their employé, Stilson, at the public stable of Mr. Briggs. He paid Mr. Briggs all he claimed for their care and keeping, and told him he was going to ship them. Briggs made no claim to their possession, nor informed him that Millar had, or claimed to have, a lien. Neither Stilson nor any other of the plaintiffs' employés is shown to have had any knowledge of the arrangement between defendant Millar and Mr. Leroy. Neither was there anything to indicate any change of possession or the existence of any lien. Under such circumstances, the plaintiffs were rightfully in the possession of their property, and their rights must be determined without regard to any arrangement between Millar, Briggs, and Leroy. The horses were therefore lawfully in Michigan, and in the possession of the plaintiffs, as mortgagees and part owners, with their chattel mortgage on file in the city where the property was then located, and without any knowledge of the defendant Millar's mortgage. The question presented by the briefs is one exclusively of the priority of liens. The case, therefore, comes directly within those above cited, and the instruction of the court was correct.

In view of this disposal of the case, the other questions raised become immaterial.

Judgment should be affirmed.

109 MICH.—14.

MONTGOMERY, J. Under the statement of facts by Mr. Justice GRANT, it appears that defendant Millar had taken possession of the property, and placed it with a custodian (Briggs), and this with the assent of the mortgagor. The property was not detained by the custodian, but, as his agency was a special one, it is clear that he exceeded his authority in delivering it over to, or permitting it to be taken by, plaintiffs. We have, then, a case in which the mortgagee in Canada has taken possession of mortgaged property, and in which the mortgagor has, without his assent, regained possession, transported the property to Michigan, and a prior lien holder has asserted a lien which, while the property was so in the possession of the Canadian mortgagee, was inferior to the Canadian lien. To give the Michigan lien priority under these circumstances is certainly to go a step further than this court has yet gone. In the cases of *Montgomery* v. *Wight*, 8 Mich. 143, *Boydson* v. *Goodrich*, 49 Mich. 65, and *Corbett* v. *Littlefield*, 84 Mich. 30, it appears that the foreign mortgagee permitted the mortgagor to retain possession. In *Corbett* v. *Littlefield* it was said distinctly that the mortgagee had it in his power to protect himself by taking possession of the mortgaged property. It can hardly be said that it was intended to imply that he must, in addition to taking possession, stand guard over the property constantly, to see that the mortgagors do not take it out of his possession and to another jurisdiction. If, in fact, Millar was invested with possession, it is difficult to see how he could have done more to protect himself, unless an absolute duty does rest upon a mortgagee to see that no person with or without right shall take the property beyond the jurisdiction; and I cannot understand why this duty should be imposed upon a mortgagee in possession any more than it is upon an absolute owner. Without regard to the record of the mortgage in Canada, it was good as against any but creditors who became such after the mortgage was made

and before possession was taken, or prior creditors who had acquired a lien before possession was taken by the mortgagee. *Waite* v. *Mathews*, 50 Mich. 392.

Certainly, plaintiffs, as mortgagees, under a mortgage executed in Michigan, upon property which was, by their direct assent, taken to Ontario, were not entitled to priority over a mortgage given in Ontario, and under which possession was given to the mortgagee. Can it be said, then, that because Briggs, the custodian, did not withhold the property from them, and because they did not in fact know of the title acquired by Millar from Leroy, they are to be given priority for this reason? I cannot understand how they could occupy any better position than a purchaser from Leroy could occupy; and if the mortgage to Millar was taken by him in good faith, and the possession was actually transferred as testified to by him, I think the mortgage as to Leroy's half interest in the horses was good, and entitled to priority over plaintiffs'.

Judgment is reversed, and a new trial ordered.

LONG, C. J., HOOKER and MOORE, JJ., concurred with MONTGOMERY, J.